1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| MARCIA WELLS, et al., | Case No. 2:21-CV-1346 JCM (EJY) |
|---|---|
| Plaintiff(s), | ORDER |
| v. | |
| CITY OF LAS VEGAS, et al., | |
| Defendant(s). | |

The remaining defendants in this case include the Las Vegas Metropolitan Police Department (the "LVMPD), Patrick Campbell, Benjamin Vasquez, Alexander Gonzalez, and Rocky Roman.  The remaining plaintiffs include Marcia Wells, Teena Acree, Tina Lewis-Stevenson, Gwendolyn Lewis, Robyn Williams, and Dewain Lewis.  The following motions are presently before the court:

- the defendants' motion for summary judgment (ECF No. 58), to which the plaintiffs responded (ECF No. 73), and the defendants replied (ECF No. 81);
- the defendants' motion in limine to exclude the testimony of plaintiffs' expert Dr. Okia (ECF No. 59), to which the plaintiffs responded (ECF No. 72);
- the plaintiffs' motion in limine to exclude the testimony of defense expert Dr. Vilke (ECF No. 62), to which the defendants responded (ECF No. 69), and the plaintiffs replied (ECF No. 80);
- the plaintiffs' motion in limine to exclude the testimony of defense expert John Ryan (ECF No. 63), to which the defendants responded (ECF No. 70), and the plaintiffs replied (ECF No. 79);

James C. Mahan
U.S. District Judge

- • the plaintiffs' motion in limine to exclude the testimony of defense expert Clarence Robert Chapman (ECF No. 64), to which the defendants responded (ECF No. 71), and the plaintiffs replied (ECF No. 78); and

- • the plaintiffs' unopposed motion for leave to file excess pages (ECF No. 76).

## I.   Background

This is a police excessive use of force case.  (*See generally* ECF No. 1).   The gravamen of the plaintiffs' complaint is that certain LVMPD officers caused the death of one Byon Lee Williams during an arrest in which excessive force was used.  (*Id.*).  Plaintiffs' complaint alleges 10 claims for relief under various federal and state theories of liability.  (*Id.*).

### A.   Procedural Background

Originally, the defendants also included Clark County, the City of Las Vegas, and Sheriff Joe Lombardo.  The plaintiffs voluntarily dismissed the City of Las Vegas and Clark County in 2021.  (ECF No. 33).   Sheriff Lombardo was dismissed from the case by the court's order granting the defendants' motion for partial dismissal of the plaintiffs' complaint.  (ECF No. 49, at 3).  In that order, the court also dismissed the plaintiffs' ninth and tenth claims.  (*Id.* at 6).  Eight claims presently remain, and the remaining defendants seek summary judgment on all of them.

### B.   Undisputed Facts

Byron Wiliams was riding a bicycle around 5:48 in the morning in September 2019 when he was pursued by LMVPD officers.  (ECF No. 73, at 7; ECF No. 81, at 3).  Officers Campbell and Vasquez attempted to stop Williams, citing a municipal code violation for not having illumination on his bike during "nighttime."  (*Id.*).   The officers were in their patrol vehicles, and Williams fled when they activated their sirens.  (ECF No. 58, at 4).  Williams quickly abandoned his bike and continued his flight on foot and Officers Campbell and Vazquez chased him on foot as well.  (*Id.* at 4–5; ECF No. 73, at 8–9).

Eventually, Williams stopped running and lay down on the ground.  (Def. Ex. C, Body Worn Camera Footage, ECF No. 58-5).  Officer Campbell was the first to reach Williams and

began handcuffing him, and Officer Vazquez caught up thereafter.  (*Id.*).  Officer Campbell kneeled on Williams during the handcuffing, and Officer Vazquez also placed weight on Williams.  (*Id.*).  Williams was eventually handcuffed, but the officers continued kneeling on him as he lay prone on the ground.  (*Id.*).  During this time, Williams repeatedly exclaimed that he could not breathe.  (*Id.*).  Officer Roman arrived on the scene after Williams was handcuffed, and also kneeled on him.  (*Id.*).  It is unclear whether all three officers kneeled on Williams at the same time, and the parties dispute how much weight was placed on Williams, where that weight was placed, and for how long.

More officers arrived.  The body-worn camera footage shows two officers lifting Williams up and attempting to put him on his feet.  (*Id.*).  Williams appears unresponsive.  (*Id.*).  The officers joke that Williams has "incarceritis," laugh, and order Williams to stand up.  (*Id.*).  Officers Roman and Gonzalez then drag Williams to a second location and place him prone on the ground.  (*Id.*).  Another officer calls for medical assistance.  (*Id.*).  Sometime after placing him prone on the ground, one of the officers begins monitoring Williams and places him on his side.  (*Id.*).  Williams appears to be unresponsive.  (*Id.*).  Many of the officers present at the scene are talking amongst themselves, and it is unclear if any of the officers ever call to expedite medical assistance.  (*Id.*).  The officers begin turning off their body-worn cameras.  (*Id.*).

Paramedics reached Williams at around six in the morning.  (ECF No. 58, at 7; ECF No. 73, at 14).  Williams was not responsive to CPR and was pronounced dead at 6:44 a.m. at Valley Hospital.  (ECF No. 58, at 7; ECF No. 73, at 14).  After an autopsy, the coroner listed the manner of death as "homicide" and noted that the officers' actions played a role in Williams's death. (Def. Ex. I, ECF No. 58-11).

. . .

. . .

. . .

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

## II.    Motions in Limine

The court first addresses the parties' motions in limine and then addresses the defendants' summary judgment motion.

### A.    Legal Standard

#### 1.    Motions in limine

"The court must decide any preliminary question about whether…evidence is admissible."  FED. R. EVID. 104.  Motions *in limine* are procedural mechanisms by which the court can make evidentiary rulings in advance of trial, often to preclude the use of unfairly prejudicial evidence.  *United States v. Heller*, 551 F.3d 1108, 1111–12 (9th Cir. 2009); *Brodit v. Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003).

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41 n.4 (1980).  Motions *in limine* may be used to exclude or admit evidence in advance of trial. *See* FED. R. EVID. 103; *United States v. Williams*, 939 F.2d 721, 723 (9th Cir. 1991) (affirming district court's ruling in limine that prosecution could admit impeachment evidence under Federal Rule of Evidence 609).

Judges have broad discretion when ruling on motions *in limine*.  *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002); *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1999) ("[t]he district court has considerable latitude in performing a Rule 403 balancing test and we will uphold its decision absent clear abuse of discretion.").  "[I]n limine rulings are not binding on the trial judge [who] may always change his mind during the course of a trial."  *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that *in limine* rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).

#### 2.    Expert Testimony

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

James C. Mahan
U.S. District Judge

or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  FED R. EVID. 702.

The district court serves a gatekeeper function in evaluating scientific testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  When a district court is faced with a proffer of scientific testimony, it must make a preliminary determination under FRE 702 whether the reasoning or methodology underlying the testimony is scientifically valid.  *Id.* at 592–93.  The key test for validity here is not "the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191–92 (9th Cir. 2007) (*citing Daubert*).

The Supreme Court has given the courts a list of non-exclusive factors to consider when determining whether expert testimony is reliable under Rule 702.  "These include: whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; whether the known or potential rate of error is acceptable;…[and] whether experts are testifying about matters growing naturally out of their own independent research, or if they have developed their opinions expressly for purposes of testifying." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (cleaned up).

The trial court must also keep out expert testimony that is not relevant and has broad latitude in exercising this function.  *Cooper v. Brown*, 510 F.3d 970, 942 (9th Cir. 2007). The court, as the proponent of evaluating whether an expert's testimony is relevant, should not limit its consideration to the strength or existence of the expert's opinion.  *See United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir. 1993). Instead, the ultimate consideration is whether the expert's testimony would assist the jury in drawing their own conclusion as to a fact at issue.  *Id.*

B.    Defendants' Motion to Exclude Dr. Okia's Testimony

Plaintiffs' expert Dr. Zelda Okia is an associate medical examiner in the Waukesha County Medical Examiner's office.  (ECF 72-1).  She is board-certified in forensic pathology and served as a general surgical pathologist in a Wisconsin hospital from 2000 to 2008.  (*Id.*).

James C. Mahan
U.S. District Judge

Before issuing her expert report, she reviewed litigation documents (including the coroner's deposition transcript), police reports, and medical files. (ECF No. 59-3). She also relied on two recently published academic articles written by the same author. (*Id.* at 7).

In Dr. Okia's opinion, the arresting officers' use of the "prone restraint" and knee-placement on Williams' back and buttocks, the high levels of methamphetamine in Williams' system, and elevated lactic acidosis due to the chase, all "indicate that Mr. Williams died as a direct result of his involvement with law enforcement." (*Id.* at 6). She states that "it is very likely that Mr. Williams may have lived had he not been chased and restrained in a prone position with varying degrees of weight placed upon his back and buttocks[,] limiting his ability to fully expand his chest." (*Id.*).

The defendants wish to exclude Dr. Okia's testimony, arguing that it is not reliable because she does not have expertise or experience specifically with prone restraint or positional asphyxia and because her opinions have not been tested or subject to peer review and publication. (ECF No. 59, at 8–9). Defendants also take issue with the fact that Dr. Okia has never testified in court as an expert in a civil case. (*Id.* at 8). The court disagrees with the defendants and denies their motion in limine. (ECF No. 59).

In *Wendell*, the Ninth Circuit found expert testimony sufficiently reliable in circumstances similar to these, where it explained that an expert's methods are not unreliable simply because they were not developed independent of litigation and had not been published. 858 F.3d at 1235. The court further explained that experts are not required to "eliminate all other possible" explanations and that experts "may rely on his or her extensive clinical experience" as a basis for his or her differential diagnosis. *Id.* at 1237. Rule 702 is meant to exclude "junk science," leaving more difficult issues to the safeguards of the adversarial system (vigorous cross-examination, presentation of contrary evidence, and jury instructions). *Id.*

Dr. Okia is a board-certified forensic pathologist with experience in differential diagnosis of causes of death. She has decades of experience in this field. She formed her opinion by reviewing the police reports, Dr. Corneal's autopsy report, Dr. Corneal's deposition, various body-worn camera footage, and peer-reviewed articles. (ECF No. 59-3, at 4). Her opinions and

1   methods are far from "junk science."  The court therefore finds that Dr. Okia employed sound

2   methodologies to reach her conclusion and her proposed testimony is sufficiently reliable.

3   Defendants' motion in limine (ECF No. 59) is denied.

4          C.       Plaintiffs' Motion to Exclude Dr. Vilke's Testimony

5          Defense expert Dr. Gary Vilke is a "board-certified emergency department physician"

6   and "independent researcher on the physiologic effects of restraint procedures."  (ECF No. 62-1,

7   at 1).  He is a full-time faculty member in the department of emergency medicine at the

8   University of California, San Diego Medical Center; a full-time, practicing clinician at a Level 1

9   trauma center; the Medical Director of Risk Management for the UC San Diego Health System;

10  and has extensive, clinical experience with people who have been subject to physical restraints.

11  (*Id.* at 21–22).

12         In Dr. Vilke's opinion, the officers' actions "did not cause or contribute" to Williams'

13  cardiac arrest and death, and placing Williams in a "recovery position" earlier "would not have

14  prevented his sudden cardiac arrest and death."  (*See generally* ECF No. 62-1).  He states that

15  "research using up to 220 [pounds] of weight on a subject's upper back has not shown to cause

16  physiologic changes that would imply asphyxiation is even possible with that amount of weight."

17  (*Id.* at 16).  He explains that because Williams "was clearly alive after the officers were no

18  longer placing any weight on him," and asphyxiation "does not happen in a delayed fashion,"

19  Willaims was not asphyxiated by the weight applied to him by the officers.  (*Id.* at 17).  Finally,

20  Dr. Vilke explains that the levels of $CO_2$ found in Williams were not indicative of asphyxiation.

21  (*Id.*).

22         Plaintiffs argue that Dr. Vilke's testimony should be excluded because his opinion does

23  not consider Williams' preexisting heart and lung diseases.  (ECF No. 62, at 5–6).  They also

24  appear to argue that Dr. Vilke's methods are unreliable because his research focuses on

25  "generally healthy individuals in a lab setting," rather than individuals "similarly situated" to

26  Williams.  (*Id.* at 6).  They essentially argue that Dr. Vilke' testimony is speculative, *ipse dixit*

27  guesswork.  (*Id.* at 7).  The court disagrees.

28

James C. Mahan
U.S. District Judge

1    Expert opinions are properly excluded as "*ipse dixit*" guesswork when "there is simply

2    too great an analytical gap between the data and the opinion offered" and the opinion is not

3    based on objective, verifiable evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997);

4    *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).  This is not the case here,

5    as Dr. Vilke draws his conclusions based on decades of experience as a clinician and his

6    particularized experience researching the effects of physical restraints on the human body.  His

7    conclusions are also supported by reasoned opinions.

8    At trial, defendants will be required to lay an adequate foundation and qualify Dr. Vilke

9    as an expert and Dr. Vilke will be subject to cross-examination by the plaintiffs.  Plaintiffs'

10   arguments regarding Dr. Vilke's methodology go to the weight of his testimony, rather than

11   admissibility, and are best addressed through cross-examination or contradicting evidence.

12   Accordingly, his testimony will not be excluded, and the plaintiffs' motion in limine (ECF No.

13   62) is denied.[1]

14       D.    Plaintiffs' motion to exclude John Ryan and Clarence Chapman's testimony.

15   Defendants proffer both Clarence Chapman and John Ryan as expert witnesses on police

16   practices and procedures.  (ECF Nos. 63-1, 64-1).  Both experts opined in their reports that the

17   officers' restraint of Williams was consistent with law enforcement practices.  (*Id.*).  Both

18   experts provide private consulting in civil litigation and lecture on police policy, procedures, and

19   practices.  (ECF No. 63-1, at 24; ECF No. 64-2).  A review of their expert reports suggests they

20   will provide very similar testimony.

21   In Mr. Chapman's opinion, the officers had probable cause to conduct a traffic

22   investigation of Williams and to pursue and arrest him after he attempted to flee.  (ECF No. 64-1,

23   at 4).  Mr. Chapman also opined that the "use of control holds and stabilizing techniques…were

24   objectively reasonable, justified, and consistent with contemporary police training…."  (*Id.* at 6).

25   Mr. Ryan's expert report provides largely the same opinions, explaining that the stop of Williams

26

27       [1] Plaintiffs additionally request that the court limit Dr. Vilke's testimony to only those

28   opinions disclosed in his expert report, and which are properly within his expertise.  (ECF No.
     62, at 7–9).  The plaintiffs are free to make objections to Dr. Vilke's testimony during trial, at
     which time the court will rule on the propriety of Dr. Vilke's specific testimony.

"was consistent with generally accepted policies, practices and training on decision making during field operations." (ECF No. 63-1, at 41). Mr. Chapman additionally opines that it is not appropriate to conclude that "in-policy and trained restraint methods were the primary cause of death." (ECF No. 64-1, at 6).

Plaintiffs move this court to exclude Mr. Ryan's testimony as including improper legal conclusions, and for being duplicative of Mr. Chapman's testimony. (ECF No. 63, at 9; ECF No. 79, at 5). They argue that Mr. Chapman's testimony should be excluded as well because some of his opinions are pure *ipse dixit*, and because it is duplicative. (ECF No. 64). The court finds that Mr. Chapman's testimony is needlessly cumulative and duplicative of Mr. Ryan's testimony, and it excludes Mr. Chapman as an expert witness in this case.

Under Federal Rue of Evidence 403, the court has discretion to exclude "needlessly" cumulative or duplicative expert testimony. *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. CV 18-06825-GW-RAOX, 2020 WL 8125550, at *3 (C.D. Cal. July 27, 2020) (collecting cases). Both of these experts have similar qualifications and—based on their expert reports—will testify to the same issues. Plaintiffs additionally argue that Mr. Chapman does not have the necessary expertise to testify as to Williams's cause of death, as he is not trained in forensic pathology or medicine. (*Id.* at 10). The court finds that Mr. Chapman's testimony is needlessly duplicative of Mr. Ryan's and includes medical opinions outside of his expertise—the court therefore excludes Mr. Chapman's testimony. Plaintiffs' motion in limine (ECF No. 64) is granted.

Plaintiffs do not contend that Mr. Ryan is unqualified to testify about police practices in general but argue that some of his opinions are actually legal conclusions. The court finds that this is an insufficient reason to exclude Mr. Ryan's testimony in its entirety. Plaintiffs may make specific objections to Mr. Ryan's testimony during trial, at which time the court will rule on those objections. Plaintiffs' motion in limine to exclude Mr. Ryan's testimony (ECF No. 63) is denied.

. . .

James C. Mahan
U.S. District Judge

1  **III.**    **Summary Judgment**

2       **A.**    Legal Standard

3       The Federal Rules of Civil Procedure allow summary judgment when the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits (if

5  any), show that "there is no genuine dispute as to any material fact and the movant is entitled to

6  judgment as a matter of law." FED. R. CIV. P. 56(a).  Information may be considered at the

7  summary judgment stage if it would be admissible at trial.  *Fraser v. Goodale*, 342 F.3d 1032,

8  1036 (9th Cir. 2003) (citing *Block v. Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)).  A

9  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

10  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

11       In judging evidence at the summary judgment stage, the court does not make credibility

12  determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

13  favorable to the nonmoving party.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

14  F.2d 626, 630–31 (9th Cir.1987).

15       When the non-moving party bears the burden of proof at trial, the moving party can meet

16  its burden on summary judgment in two ways: (1) by presenting evidence to negate an essential

17  element of the non-moving party's case; or (2) by demonstrating that the non-moving party

18  failed to make a showing sufficient to establish an element essential to that party's case on which

19  that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.  If the

20  moving party fails to meet its initial burden, summary judgment must be denied, and the court

21  need not consider the non-moving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S.

22  144, 159–60 (1970).

23       If the moving party satisfies its initial burden, the burden then shifts to the opposing party

24  to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith*

25  *Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the

26  opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

27  that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

28  differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

**James C. Mahan**
**U.S. District Judge**

1    However, the nonmoving party cannot avoid summary judgment by relying solely on

2    conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040,

3    1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of

4    the pleadings and set forth specific facts by producing competent evidence that shows a genuine

5    issue for trial.  *See Celotex*, 477 U.S. at 324.  If the nonmoving party's evidence is merely

6    colorable or is not significantly probative, summary judgment may be granted.  *Anderson v.*

7    *Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

8         B.    Discussion

9              1.    Excess Pages

10   As an initial matter, the court must address the plaintiffs' motion for leave to file excess

11   pages.  (ECF No. 76).  Plaintiffs request leave to file a response to defendants' motion for

12   summary judgment that exceeds the thirty-page limit imposed by Local Rule 7-3.  *Id.*; *see* LR 7-

13   3(a) ("[m]otions for summary judgment and responses to motions for summary judgment are

14   limited to 30 pages, excluding exhibits.").  The defendants do not oppose this request.  (ECF No.

15   77).  The court accordingly grants the plaintiffs' request under LR 7-2(d).

16             2.    Section 1983 Excessive Force and State Law Battery Claims

17   Plaintiffs' fourth and fifth claims for battery and Section 1983 violations are alleged

18   against Officers Campbell, Vasquez, and Roman.  (ECF No. 1, at 27, 29).  The gravamen of

19   these two claims is that the officers used excessive force against Williams when they handcuffed

20   him and when they dragged him to the second location, in violation of clearly established law.

21   (*Id.* at 27–31).  The officers argue that they are entitled to summary judgment on these claims

22   due to qualified immunity and because their use of force was reasonable under the

23   circumstances.  (ECF No. 58, at 13, 19).

24             *a.    The excessive force inquiry.*

25   42 U.S.C. § 1983 "does not create any substantive rights; rather it is the vehicle whereby

26   plaintiffs can challenge actions by governmental officials." *Jones v. Williams*, 297 F.3d 930, 934

27   (9th Cir. 2002).  A prima facie case under Section 1983 requires the plaintiff to allege that (1) the

28   action occurred under color of law and (2) "the action resulted in the deprivation of a

James C. Mahan
U.S. District Judge

constitutional right or federal statutory right." *Id.*   The defendants concede that Officers Campbell, Vazquez, and Roman acted under color of law when arresting Wiliams.  (ECF No. 58, at 11).  The plaintiffs have also successfully alleged a deprivation of constitutional rights, as *Graham* "clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Ninth Circuit has repeatedly held that summary judgment in excessive force cases should be granted "sparingly" because the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).  The court must also "be mindful that cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably because the witness most likely to contradict the officers' story is unable to testify." *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quotations omitted).  Summary judgment should be denied in such cases where "a jury might find that the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force." *Id.* (citations omitted).

According to *Graham*, when determining whether an officer has used excessive force during an arrest or investigatory stop, the court must pay "careful attention to the facts and circumstances of each particular case" from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (cleaned up).

"In *Graham*, the Supreme Court specified that the government interest in safely effecting an arrest must be examined in light of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Drummond*, 343 F.3d. at 1057 (citations

1    omitted).  "Force, even if less than deadly, is not to be deployed lightly."  *Id.* (citations omitted).

2    "The essence of the *Graham* objective reasonableness analysis is that the force which is applied

3    must be balanced against the need for that force: it is the need for force which is at the heart of

4    the *Graham* factors."  *Id.* (citations omitted).

5          Under Nevada common law, officers "are privileged to use that amount of force which

6    reasonably appears necessary, and are liable for battery to the extent they use more force than is

7    reasonably necessary."  *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (citations

8    omitted); *accord Est. of Brenes v. Las Vegas Metro. Police Dep't*, 468 P.3d 368, 2020 WL

9    4284335, at *1 (Nev. 2020) (table decision).  Liability for battery therefore attaches when the

10   officers' use of force exceeds that which is objectively reasonable under the circumstances.  *Id.*

11   The standard for common-law battery in Nevada thus mirrors federal civil rights law, and the

12   court's analysis under federal law applies to the plaintiffs' common-law battery claim.  *Id.*

13                              *i.      The officer's actions during handcuffing.*

14         The *Graham* factors all point toward a denial of the defendants' summary judgment

15   motion on the plaintiffs' fourth and fifth claims, as they relate to the officers' conduct during

16   handcuffing (before he was moved to the second location).  The parties squabble over whether

17   Williams was actually violating a local law when the officers activated their sirens and attempted

18   to stop him.  (*Compare* ECF No. 58, at 3 *with* ECF No. 73, at 7–8).  But it is *not* disputed that the

19   alleged violation was a misdemeanor municipal code offense for not having lights on a bicycle at

20   night.  (*Id.*).  The first *Graham* factor is therefore in plaintiffs' favor.  The crime for which

21   Williams was allegedly being stopped was not only exceedingly minor but also a nonviolent one.

22         The defendants appear to argue that the underlying crime is actually evading arrest,

23   which the Supreme Court, in *Sykes*, held is a crime of violence.  564 U.S. 1 (2011); (ECF No. 58,

24   at 16).  This argument fails for several reasons.  First, *Sykes* is inapplicable to this case because it

25   involved *motor vehicle* flight.  564 U.S. at 9–10.  The Supreme Court held that there is an

26   inherent "risk of violence" when a defendant evades arrest in a motor vehicle because "the

27   intervening pursuit creates high risk of crashes."  *Id.* at 10.  Williams fled on foot.  Second, the

28   question in *Sykes* was not whether vehicle flight is a crime of violence when evaluating officers'

**James C. Mahan**
**U.S. District Judge**

1    use of force, but rather whether vehicle flight is a violent felony for purposes of the Armed

2    Career Criminal Act. *Id.* at 16.

3         Regardless, evading arrest is not the relevant underlying crime in this case for *Graham*

4    purposes, because whether the defendant evades arrest is already accounted for as one of the

5    other factors for the court to consider.  The underlying offense is the offense for which the

6    officers first attempted to stop the defendant.  The underlying offense in this case was the alleged

7    minor municipal code violation.

8         Turning to the remaining *Graham* factors (whether the suspect poses an immediate threat

9    to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

10   evade arrest by flight), while Williams did initially attempt to evade arrest by flight on foot, he

11   eventually surrendered himself by lying prone on the ground.  (Def. Ex. C, Body-Worn Camera

12   Footage, ECF No. 58-5).  By the time the officers caught up to him, Williams was already on the

13   ground.  (*Id.*).  In other words, by the time the officers reached him, Williams was no longer

14   "actively" resisting arrest.  And—at least two officers were present to handcuff Williams and

15   maintained weight on Williams even after he was successfully handcuffed.  (*Id.*).  A jury could

16   reasonably find that Williams "posed only a minimal threat to anyone's safety" once on the

17   ground and handcuffed and that the officers used excessive force by continuing to kneel on him

18   post-handcuffing.  *Drummond*, 343 F.3d at 1057–58.

19        Defendants argue that Williams "resisted the officers' attempt to handcuff him for about

20   41 seconds," which justified the officers' use of force.  (ECF No. 58, at 17).  But this is merely

21   an attempt to frame disputed facts in their favor and is insufficient on a summary judgment

22   motion.  A reasonable jury, upon viewing the body-worn camera footage, could conclude that

23   Williams was not resisting the officers and that any delay in handcuffing was due to the

24   difficulty in moving his arms after he was pinned to the ground by no less than two officers.

25        Defendants also argue that it was reasonable for Officer Campbell to kneel on Williams

26   because it was "just long enough…to update dispatch and momentarily catch his breath" and

27   because it was "just long enough" to safely search Williams and "render" the scene safe.  (ECF

28   No. 58, at 17).  The court disagrees.  The body-worn camera footage arguably shows the officers

kneeling on Williams for some time, post-handcuffing, without conducting any type of search or safety check.  (Def. Ex. C, Body-Worn Camera Footage, ECF No. 58-5).  A jury could find that Williams was no longer a threat once he was handcuffed and that it was unreasonable for Officer Campbell to kneel on Williams, rather than the ground next to him, to "catch his breath."

Finally, the defendants argue that summary judgment is appropriate because the officers' use of force was not the proximate cause of Williams's death.  (ECF No. 58, at 20).  To succeed on a Section 1983 claim, "the plaintiff must establish both cause-in-fact and proximate causation."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  Proximate cause exists when "an act or omission played a substantial part in bringing about or actually causing the injury or damage."  *Id.*  Summary judgment cannot be granted here because there is a dispute of fact over causation.

The coroner who performed the autopsy in this case, Dr. Corneal, stated that placing Williams in a prone restraint was one of the contributing factors to his death.[2]  (ECF No. 58-12, at 13).  She explains that the officers' placement of Williams in a prone restraint position could have "compromise[d] his ability to breathe out."  (*Id.*).  She additionally adds that, though she cannot say how much of a contributing factor the prone restraint was to Williams's death, it was "significant" and "part of why he is deceased."  (*Id.*).

The defendants' medical expert, Dr. Vilke, opined that the officers' actions did not cause or contribute to Williams's death.  (*See generally* Dr. Vilke's Dep., ECF No. 62-1).  But Dr. Okia, the plaintiffs' medical expert, testified that she believes the officers' actions were a "significant factor" in Williams's death.  (Dr. Okia's Dep., ECF No. 59-4, at 7).[3]  This is a

---

[2] Defendants claim that Dr. Corneal only referred to the officers' placement of Williams in the prone restraint position at the second location as a contributing cause of death (ECF No. 58, at 21–22), but their own exhibits belie that claim.  During her deposition, Dr. Corneal answered "yes" to the question of whether she was referring to "restraining Mr. Williams in the prone position" *and* "*also* referring to officers moving Mr. Williams and placing him prone for the second time."  (Dr. Corneal's Dep., ECF No. 58-12, at 13) (emphasis added).

[3] Defendants, again, misrepresent the evidence by claiming that Dr. Okia "agrees that the officers did not asphyxiate" Williams and that the weight placed on him was "unimportant." (ECF No. 58, at 22).  Although this is technically true, it does not change the fact that Dr. Okia's opinion is that the officers' actions were a contributing factor to Williams's death.  She testified that Williams died, in part, from a lack of blood circulation caused by the officers' placement of weight on Williams.  (*Id.*).

quintessential dispute of material fact that cannot be resolved on a summary judgment motion. Despite the defendants' attempts to reframe the disputed facts in their favor, viewing the evidence in the light most favorable to the nonmoving party, a reasonable jury could conclude that the officers used an unreasonable amount of force against Williams and that this caused his death.

ii.     *Dragging Williams to the second location.*

The plaintiffs also allege that the officers' act of dragging Williams to a second location and leaving him prone on the ground was an excessive use of force.  The defendants argue that this particular use of force was reasonable because they needed to move Williams to a location that would be more accessible to the medical team, once they arrived.  (ECF No. 58, at 9).  They argue that *Tatum* establishes that officers are permitted to place defendants on their "stomach for approximately ninety seconds" so long as they do not apply "crushing pressure" to the defendant's back and neck.  *Tatum v. City and Cnty of San Francisco*, 441 F.3d 1090, at 1098 (9th Cir. 2006).  (ECF No. 58, at 15, 17).  And, as the officers in this case did not place crushing pressure on Williams once they moved him to the second location, their actions were reasonable. (*Id.* at 17).

Under *Tatum*, "[r]estraining a person in a prone position is not, in and of itself, excessive force *when the person restrained is resisting arrest*."  441 F.3d at 1098 (emphasis added).  The *Tatum* court found that summary judgment was appropriate because the officers' use of force was reasonable under the totality of the circumstances and the "escalating situation they faced." *Id.* at 1098.  The suspect in *Tatum* was actively struggling as the officers attempted to secure and handcuff him, and the officers monitored him continuously while he was prone on the ground. *Id.*  Prior to handcuffing, the suspect had been behaving erratically.  *Id.*

By contrast, a jury could conclude that it was unreasonable in this case for the officers to place Williams prone on the ground as he had not resisted arrest and was no longer a threat, once handcuffed.  There is also a dispute of fact over whether placing Williams on his stomach contributed to his death, and whether he should have been placed on his side, particularly since he had exhibited signs of distress before they placed him on the ground.

**James C. Mahan**
**U.S. District Judge**

- 16 -

1    However, balancing the *Graham* factors, the court finds that it was a reasonable use of

2    force for the officers to move Williams to a second location to make him more accessible to the

3    medical team.  Accordingly, the court finds that it was not unreasonable for the officers to move

4    Wiliams to the second location to make him more accessible to the medical response team.  But

5    there is a dispute of fact over whether it was reasonable for them to then lay him prone on the

6    ground after they had moved him.  Summary judgment is denied on plaintiffs' fourth claim.

7                            *b.*      *The qualified immunity inquiry.*

8        Qualified immunity insulates public officials "from liability for civil damages insofar as

9    their conduct does not violate clearly established constitutional rights of which a reasonable

10   person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

11   *Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is broad, protecting "all but the

12   plainly incompetent or those who knowingly violate the law." *Lee v. Gregory*, 363 F.3d 931,

13   934 (9th Cir. 2004) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Qualified immunity is

14   not merely a defense to liability, but a privilege of immunity from suit, and must therefore be

15   resolved "at the earliest possible stage in litigation." *Saucier*, 533 U.S. at 202.  Qualified

16   immunity is a federal common law doctrine and, as such, does not immunize defendants from

17   liability under state law. *Mack v. Williams*, 522 P.3d 434, 450 (Nev. 2022).

18       To establish qualified immunity, the court must determine that the defendant's actions

19   violated a constitutional right and that the right was clearly established such that "it would be

20   clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at

21   202.   The court must consider "the specific context of the case" and not "broad general

22   proposition[s]." *Id.* at 202.  The court views facts in the light most favorable to the plaintiff, but

23   it is the plaintiff's burden to show that the constitutional right was clearly established. *Sorrels v.*

24   *McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

25       The qualified immunity inquiry is separate from the excessive force inquiry.   The

26   excessive force inquiry tasks the court with determining whether an officer used an unreasonable

27   amount of force, under the circumstances. *Saucier*, 533 U.S. at 204–205.  Then, even assuming

28   that the use of force was unreasonable, qualified immunity "operates to grant officers immunity

**James C. Mahan**
**U.S. District Judge**

1    for reasonable mistakes as to the legality of their actions." *Id.* at 205–206.  The dispositive

2    question is whether, at the time that excessive force was employed, the *legal* precedent was

3    "clear enough that every reasonable official would interpret it to establish the particular rule the

4    plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

5                          i.      *The officer's actions during handcuffing.*

6         Plaintiffs argue that the officers violated clearly established law when they handcuffed

7    Williams and then placed their body weight on him while he was retrained in a prone position on

8    the ground.  (ECF No. 73, at 22).  The court finds that the legal precedent was clear at the time of

9    Williams's arrest such that any "reasonable officer" would have known that this "conduct was

10   unlawful in the situation he confronted." *Saucier*, 533 at 202 (*quoting Anderson v. Creighton*,

11   483 U.S. 635, 640 (1987)).

12        The Ninth Circuit, in *Drummond*, clearly established that "squeezing the breath from a

13   compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force

14   that is greater than reasonable." 343 F.3d at 1059–62.  The court explained that once a defendant

15   is handcuffed "on the ground" and not resisting the arresting officers, there is no longer a need

16   for "*further* physical force." *Id.* at 1058 (emphasis added).

17        The defendants argue that under *Drummond* and *A.B. v. Cnty. of San Diego*,[4] their use of

18   force did not violate clearly established law.  They first argue that *Drummond* established only

19   that use of force is excessive when officers place their "entire body weight" on the defendant for

20   "twenty minutes."  (ECF No. 58, at 19–20).  They argue that there is "no evidence the officers

21   ever put their full body weight" on Williams and that the amount of time that Williams was

22   under the weight was trivial.  (*Id.* at 20).

23        The court disagrees with the defendants' narrow construction of *Drummond* and their

24   characterization of the evidence.  The Ninth Circuit clearly explained that force becomes

25   excessive *as soon as* the defendant is "knocked to the ground," handcuffed, and no longer

26   resisting.  343 F.3d, at 1057–58.  It is at this point that there is no longer any need for "further

27   physical force," not twenty minutes later, as the defendants suggest. *Id.*  Furthermore, based on

28

---

[4] *A.B. v. Cnty. of San Diego*, No. 20-56140, 2022 WL 1055558  (9th Cir. Apr. 8, 2022).

**James C. Mahan**
**U.S. District Judge**

1   the defendants' own evidence (the body-worn camera footage), a reasonable jury could conclude

2   that at least two, if not three, officers put their full weight on Williams in a crushing manner,

3   after he was already handcuffed on the ground and no longer resisting.  (Def. Ex. C, Body-Worn

4   Camera Footage, ECF No. 58-5).

5   In *A.B.*, the officers' actions were considered reasonable because they merely held the

6   defendant in place after he was handcuffed.  *A.B. v. Cnty. of San Diego*, No. 20-56140, 2022 WL

7   1055558, at *2 (9th Cir. Apr. 8, 2022).  The circuit court specifically explained that the case was

8   distinguishable from *Drummond* because the officers had not placed weight on the defendant's

9   body.  *Id.*  Based upon the defendant's own cited cases—and the actions captured on video—a

10  reasonable jury could conclude that the officers violated clearly established law.  They are

11  therefore not entitled to qualified immunity for their actions during Williams's handcuffing.

12  Summary judgment is denied against the plaintiffs' fifth claim.

13                          *ii.*      *Dragging Williams to the second location.*

14  The plaintiffs argue that the officers used excessive force during and after dragging

15  Williams to the second location after they handcuffed him.  (ECF No. 73, at 22).  The court finds

16  that the plaintiffs have not met their burden of showing that this violated a clearly established

17  constitutional right.  As explained above, the inquiry for a qualified immunity determination is

18  whether there is clear, legal precedent that the officers' specific use of force was unreasonable.

19  The plaintiffs have not provided the court with that legal precedent.[5]  (*See generally* ECF No.

20  73).

21  The court therefore finds that Officers Campbell, Vasquez, and Roman are entitled to

22  qualified immunity for their actions during and after dragging Williams to the second location.

23  However, because qualified immunity is a federal doctrine, this ruling applies only to the

24  plaintiffs' fifth claim under federal law, and not to the plaintiffs' fourth claim for battery under

25  state law.

26

27          [5] Although *Tatum* establishes when it is *reasonable* to place a suspect on their stomach, it
    does not clearly establish when it is *unreasonable* to place a suspect on their stomach, and
28  therefore could not have put the officers on notice that their actions were an unreasonable use of
    force.

James C. Mahan
U.S. District Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.    Section 1983 Medical Needs Claim

The plaintiffs' sixth claim is alleged against Officers Campbell, Vasquez, Gonzalez, and Roman. (ECF No. 1, at 31). Plaintiffs allege a Section 1983 violation for the officers' disregard of Williams's medical needs. (*Id.*). The Supreme Court has held that "the Due Process Clause requires the provision of medical care to 'persons…who have been injured while being apprehended by the police.'" *Tatum*, 441 F.3d at 1099 (*citing City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Under the Fourth Amendment, officers are not required "to provide what hindsight reveals to be the most effective medical care for an arrested suspect," but what would have been "objectively reasonable post-arrest care" at the time. *Id.* 1098–99. This is satisfied "by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id.* at 1099.

Defendants argue that summary judgment on this claim is appropriate because Officer Cory called for medical assistance "just two minutes and forty seconds after the completion of handcuffing," which meets the "promptly" standard. (ECF No. 58, at 24). They alternatively argue that the officers are entitled to qualified immunity because there is no clearly established law that their actions were deficient under the Fourth Amendment. (*Id.*).

Plaintiffs counter that, although an ambulance was called within three minutes of Williams's arrest, it was done after Williams had repeatedly stated he could not breathe, after he "stopped talking and started mumbling and moaning incoherently," and after his body went limp. (ECF No. 73, at 40). They argue that *Tatum* clearly establishes that officers are required to monitor a detainee's condition and call for medical assistance as soon as they notice he is in medical distress. (*Id.* at 40–41). In this case, Williams stated he could not breathe repeatedly before Officer Cory finally called for medical assistance, and the officers did not monitor Williams or put him in a "recovery" position until sometime after he had already shown signs of distress. (Def. Ex. C, Body-Worn Camera Footage, ECF No. 58-5).

The court finds that summary judgment is appropriate on this claim. In *Tatum*, the court noted that the "critical inquiry is not whether the officers did all that they could have done, but

whether they did all that the Fourth Amendment requires."  441 F.3d at 1099.  The Constitution requires the officers to do no more than promptly request medical assistance.  *Id.*  The question is objective reasonableness, not what "hindsight reveals to be the most effective medical care for an arrested suspect."  *Id.*  "Whether the officers acted reasonably and were sufficiently 'prompt' depends in part on the length of the delay and the seriousness of the need for medical care."  *Holcomb v. Ramar*, Case No. 1:13-cv-1102-AWI-SKO, 2013 WL 5947621, at *4 (E.D. Cal. Nov. 4, 2013).

Here, medical assistance was called for within minutes of Williams's arrest and claims of discomfort.  The officers could not have known that Williams was suffering from heart and lung conditions when they arrested him.  The court cannot rule that the officers' actions were objectively unreasonable when they called for medical assistance within minutes of Williams's arrest.  And, as the court explained above, the Constitution requires no more.  Summary judgment is therefore appropriate on the plaintiffs' sixth claim.

### 4.    The *Monell* Claims

The plaintiffs appear to make two Section 1983 *Monell* claims; one under a failure to train theory of liability and one under a ratification theory of liability, both alleged against the LMVPD.  (ECF No. 1, at 35, 39).  The court addresses each in turn.

### a.    Failure to Train Claim

There is no *respondeat superior* liability under Section 1983.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978).  Instead, for a municipal entity to be liable for damages on a Section 1983 claim, the plaintiff must prove that: (1) he or she was deprived of a constitutional right; (2) the municipality had a policy or lack of adequate training; (3) that this policy or lack of adequate training amounts to a deliberate indifference to the plaintiff's constitutional right; and (4) this policy or lack of adequate training was the "moving force" behind the constitutional violation.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (overruled on other grounds by *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

James C. Mahan
U.S. District Judge

1    "Liability for improper custom may not be predicated on isolated or sporadic incidents; it
2    must be founded upon practices of sufficient duration, frequency and consistency that the
3    conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911,
4    918 (9th Cir. 1996).  However, for an adopted municipal policy, a single incident can serve as
5    the basis of a *Monell* claim so long as "proof of the incident includes proof that it was caused by
6    an existing, unconstitutional municipal policy, which policy can be attributed to a municipal
7    policymaker." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

8        The plaintiff must also demonstrate the municipality's "deliberate indifference" to
9    constitutional rights, which occurs "when the need for more or different action is so obvious, and
10   the inadequacy [of the current procedure] so likely to result in the violation of constitutional
11   rights, that the policymakers…can reasonably be said to have been deliberately indifferent to the
12   need." *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001).  This is "generally" a
13   question for the jury.  *Id.*

14       Plaintiffs allege that the LVMPD had "unwritten policies, customs, and practices" in
15   place allowing "inherently dangerous foot pursuits for minor ordinance violations," failed to
16   "train law enforcement officers about the danger and likely injury when subjecting individuals to
17   prone restraint and placing the officer's body weight on subjects' backs," and failed to "train law
18   enforcement officers about the danger and likely injury of failing to use a recovery position or
19   proper tactics if a positional restraint is utilized…."  (ECF No. 1, at 35–36; ECF No. 73, at 43–
20   44).

21       The defendants argue that summary judgment is appropriate because there's evidence
22   that the officers were trained on the dangers of "positional asphyxia."  (Def. Ex. P, ECF No. 58-
23   18, at 14–15).  Defendants provide an LVMPD lesson plan for "Prisoner Handling" which
24   instructs officers that it is "vital, once the suspect is handcuffed, to get him off his stomach and
25   either onto his side or sitting up."  (*Id.* at 15).  The lesson plan also informs officers to be aware
26   of contributing factors to a "subject's susceptibility to sudden death" from positional asphyxia
27   such as "being tied or handcuffed in a prone position," "obesity, psychosis," "drug or alcohol
28   induced behavior," and "foot pursuit."  (*Id.*).

James C. Mahan
U.S. District Judge

1    Deputy Chief LaRochelle of the LVMPD testified that LVMPD officers are trained on

2    the dangers of "placing somebody on their stomach face down." (Def. Ex. Q, ECF No. 58-19, at

3    7–8). He additionally testified that officers are trained to place a person on their side post-

4    handcuffing and to monitor breathing and circulation. (*Id.* at 8). He stated that officers are

5    required to complete yearly training on the LVMPD's policies regarding use of force and

6    providing medical care to detainees. (*Id.* at 9).

7    However, viewing the evidence in the light most favorable to the nonmoving party, there

8    is an obvious lack of training regarding the dangers of kneeling on a suspect after he has already

9    been handcuffed and subdued, and whether this is an excessive use of force. Officer Campbell

10   testified that he has kneeled on other handcuffed suspects in the past, and none of the other

11   officers affirmatively stated that they received training on this issue. (ECF No. 58-3, at 10). The

12   defendants' evidence shows only that LVMPD officers are trained to monitor for "positional

13   asphyxia," and not on the dangers of placing weight on prone suspects.

14   Given the Ninth Circuit's holding in *Drummond*, and the obvious danger of placing

15   crushing body weight on a prone suspect who is already handcuffed and subdued, a jury could

16   conclude that the need for training on this issue was "so obvious" that the defendants exhibited a

17   "deliberate indifference" to the constitutional rights of suspects. The court therefore finds that

18   summary judgment is not appropriate on the plaintiffs' seventh claim for the specific issue of

19   lack of training on placing weight on a subdued and handcuffed suspect.

20                           *b.      The Ratification Claim*

21   *Monell* liability may also be shown via ratification: when an official with "final policy-

22   making authority…ratifie[s] a subordinate's unconstitutional decision or action and the basis for

23   it." *Clouthier*, 591 F.3d at 1250 (citations omitted). An authorized policymaker's ratification of

24   a subordinate's decision, and the basis for it, is chargeable to the municipality if there is evidence

25   of a "conscious, affirmative choice" on the part of the authorized policymaker. *Id.* "A local

26   government can be held liable under § 1983 'only where a deliberate choice to follow a course of

27   action is made from among various alternatives by the official or officials responsible for

28   establishing final policy with respect to the subject matter in question.'" *Id.* (citations omitted).

James C. Mahan
U.S. District Judge

1    The plaintiffs argue that as the officers were not disciplined for excessive use of force, a

2    jury could conclude that the LVMPD "ratified" the officers' actions and is therefore liable under

3    *Monell*.   (ECF No. 73, at 53).   They further point to Sheriff Joe Lombardo's deposition

4    testimony, where he states that he believes the officers involved in the incident responded

5    correctly, based on their training.  (*Id.* at 15, 53).  The defendants counter that a mere failure to

6    discipline is insufficient and that ratification requires a "conscious, affirmative choice," which is

7    not present here.  (ECF No. 81, at 20).

8    It is not disputed that the LVMPD's "Critical Incident Review Team" and "Force

9    Investigation Team" conducted investigations following Williams's death.  (ECF No. 58, at 10;

10   ECF No. 73, at 14).  It is also undisputed that the LVMPD did not discipline any of the officers

11   for excessive use of force.   (*Id.*).   But upon review of plaintiffs' Exhibit 9 (findings and

12   conclusions of the LVMPD's internal oversight review of the incident), the court cannot find that

13   there is sufficient evidence of ratification to survive summary judgment.

14   The Ninth Circuit has held that liability under the ratification doctrine requires more than

15   the municipality's mere "acquiescence" or even defense of the subordinate's actions.  *Gillette v.*

16   *Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  The doctrine requires that the subordinate's

17   actions be "cast in the form of a policy statement and expressly approved by the supervising

18   policymaker" or else "a series of decisions by a subordinate official manifest[ing] a 'custom or

19   usage' of which the supervisor" was aware.  *Id.* (*quoting St. Louis v. Praprotnik*, 485 U.S. 112

20   (1988).  To hold a supervising policymaker liable anytime it gave deference to its subordinate's

21   discretionary actions would result in a doctrine "indistinguishable from *respondeat superior*

22   liability," which Section 1983 explicitly disallows.  *See id.* (quoting *Praprotnik*).

23   The plaintiffs have not met their burden on summary judgment for this claim.  Sheriff

24   Lombardo's deposition testimony is insufficient to establish "a custom or usage," or to cast the

25   officers' actions as LVMPD policy.[6]   The LVMPD internal oversight review report also

26   explicitly concluded that the officers "should have immediately rolled Williams onto his side

27

28   _____

[6] And neither are the results of the Critical Incident Review report, which merely found the officers' use of force "reasonable," but did not establish an affirmative LVMPD policy or custom for the officers' actions.  (Def. Ex. R, ECF No. 85, at 81).

James C. Mahan
U.S. District Judge

- 24 -

1   after seeing him detained on his stomach." (Pl.'s Ex. 9, ECF No. 73-9, at 8). It did not make an

2   explicit finding that the officers' act of kneeling on Williams was an LVMPD-approved policy.

3   (*See generally id.*). Though the plaintiffs may have provided the court with sufficient evidence

4   under their failure to train claim, they have not met their burden on summary judgment for their

5   ratification claim. The court accordingly grants summary judgment in defendants' favor on the

6   plaintiffs' eighth claim for relief.

7                    5.       The remaining state law claims.

8                        a.       *Wrongful Death*

9        The plaintiffs' first claim for relief is for wrongful death based on battery. (ECF No. 1, at

10   22). "NRS 41.085 creates an independent cause of action in the heirs and personal

11   representatives of one whose death is caused by the wrongful act or neglect of another." *Gilloon

12   v. Humana Inc.*, 687 P.2d 80, 81 (Nev. 1984). As the court has already addressed the issue of

13   causation and battery above, it need not address it again. This claim survives summary judgment

14   because the court found that there is a dispute of fact over whether the officers' use of force

15   during the handcuffing and at the second location caused Williams's death and whether the

16   officers' use of force constituted a battery.

17                        b.       *Negligence*

18        The plaintiffs' second claim for relief is for wrongful death based on negligence and is

19   alleged against the LVMPD, Officer Campbell, Officer Vazquez, Officer Gonzalez, and Officer

20   Roman. (ECF No. 1, at 23). The plaintiffs' third claim is styled as "Negligence — Survival,"

21   and is brought against the same defendants. (*Id.* at 25). "To prevail on a negligence theory, the

22   plaintiff generally must show that: (1) the defendant had a duty to exercise due care towards the

23   plaintiff; (2) the defendant breached that duty; (3) the breach was the *actual* cause of the

24   plaintiff's injury; (4) the breach was the *proximate* cause of the injury; and (5) the plaintiff

25   suffered damage." *Perez v. Las Vegas Med. Ctr.*, 805 P.2d 589, 591 (Nev. 1991). "Whether a

26   defendant owes a duty of care is a question of law." *Scialabba v. Brandise Const. Co., Inc.*, 921

27   P.2d 928, 930 (Nev. 1996). The court addresses the officers' actions during the arrest—and

28   subsequently moving Williams to the second location—separately.

James C. Mahan
U.S. District Judge

- 25 -

The defendants argue that liability under a negligence theory cannot be based on an *intentional* use of force.[7]  (ECF No. 58, at 27).  The court agrees.  Although the Nevada Supreme Court has not yet addressed the specific issue of negligence and excessive force by police officers, it has stated that negligence is an "unintentional tort," which "must be distinguished from a person guilty of willful misconduct, such as assault and battery."  *Rocky Mountain Produce Trucking Co. v. Johnson*, 369 P.2d 198, 201 (Nev. 1962).  "If conduct is negligence, it is not willful; if it is willful, it is not negligence."  *Id.*  The court further explained that when a person "with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, that it is highly probable that harm will result...*[i]t is most accurately designated as reckless misconduct*."  *Id.*

Citing the Restatement (Second) of Torts, the Nevada Court of Appeals also recently distinguished between negligence and "intentional or reckless misconduct."  *Kuchta v. Opco*, 466 P.3d 543, 2020 WL 3868434, at *11–12 (Nev. Ct. Ap. 2020) (unpub. decision).  The tort of negligence, which focuses on the act or omission to act "when there is a duty to do so,"  does not cover conduct that intentionally or recklessly causes harm.  Restatement (Second) of Torts § 282 (1965).   Negligent, intentional, and reckless conduct are "mutually exclusive" and "contradictory" theories of liability.  65 C.J.S. *Negligence* § 16 (2024).  An act that constitutes the intentional act of battery "cannot constitute negligence."  *Id.*  It is the *absence* of intent that "is essential to the legal conception of negligence."  65 C.J.S. *Negligence* § 27 (2024).

Where the state's highest court has not decided an issue of law, the district court's task is to "predict" how that court would rule.  *Hayes v. Cnty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011).  Although the Nevada Supreme Court has not addressed the specific issue of whether police officers may be held liable under a negligence theory of liability for their alleged use of excessive force, this court is persuaded that, under *Rocky Mountain*, it would hold that they cannot.  Because negligence and battery are considered mutually exclusive grounds for liability, and excessive force is analyzed under a battery theory of liability, police officers accused of

---

[7] Insofar as the parties have raised other arguments that are not specifically addressed in this order, the court has considered the same and concluded that they either do not present a basis for relief or need not be reached given the court's ultimate ruling.

1    excessive force cannot also be liable for negligence for the same act that constitutes the battery.

2    The court therefore finds that summary judgment is appropriate on plaintiffs' second and third

3    claims as it relates to the officers' acts during the handcuffing and when they placed Williams

4    prone on the ground at the second location.

5          However, the plaintiffs also allege that the defendants were negligent through their

6    failure to monitor Williams and provide him with adequate medical attention, which is a separate

7    inquiry from battery. (ECF No. 1, at 24; ECF No. 73, at 55). The defendants do not address this

8    particular issue and have therefore not met their burden on summary judgment. (*See generally*

9    ECF Nos. 58, 81). The defendants cite the privilege of discretionary immunity under NRS

10   41.032 but provide no analysis of why it should apply to the plaintiffs' allegation of negligence

11   as it relates to the officers' inactions. The court therefore declines to grant summary judgment

12   against the plaintiffs' second and third claims, as to the issue of negligence in failing to monitor

13   Williams and provide him with adequate medical attention.

14   **IV.    Conclusion**

15         Accordingly,

16         IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the defendants' motion

17   for summary judgment (ECF No. 58) be, and the same hereby is, GRANTED in part and

18   DENIED in part. Specifically, summary judgment is granted in favor of the defendants on

19   plaintiffs' sixth and eighth claims ONLY. Summary judgment is denied on plaintiffs' first,

20   second, third, fourth, fifth, and seventh claims.

21         IT IS FURTHER ORDERED that the defendants' ECF No. 59 motion in limine is

22   DENIED.

23         IT IS FURTHER ORDERED that the plaintiffs' ECF No. 62 motion in limine is

24   DENIED.

25         IT IS FURTHER ORDERED that the plaintiffs' ECF No. 63 motion in limine is

26   DENIED.

27         IT IS FURTHER ORDERED that the plaintiffs' ECF No. 64 motion in limine is

28   GRANTED.

**James C. Mahan**
**U.S. District Judge**

1   IT IS FURTHER ORDERED that the plaintiffs' request for leave to file excess pages

2 (ECF No. 76) is GRANTED.

3   DATED May 7, 2024.

4

5         UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**James C. Mahan**
**U.S. District Judge**